UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DONALD E. TURNER, JR., as
Personal Representative of the Estate
of LOGAN M. TURNER, deceased,

      Plaintiff,

v.                                CASE NO. 5:19-cv-00140-MCR/MJF

LT. PHILLIPS, *et. al*.,

      Defendants.

_____/

## MOTION FOR SUMMARY JUDGMENT
## BY DEFENDANT JACK HOWELL

      Pursuant to Federal Rule of Civil Procedure 56, and Local Rule 56.1, Defendant JACK L. HOWELL, JR., MS, LMHC, moves for final summary judgment in his favor and states:

      1.    This case arises out of the May 18, 2018, suicide of inmate Logan Turner ("Turner") while confined in the Bay County Jail. [ECF.25-1].

      2.    Plaintiff sues Licensed Mental Health Counselor Jack L. Howell, Jr. ("Howell") for medical deliberate indifference and negligence for his alleged failure to properly assess and treat Turner for the risk of suicide. [*Id*. at Counts IV and VII].

      3.    Plaintiff's federal deliberate indifference claims fail because the undisputed facts demonstrate that Howell provided Turner with considered,

timely, and appropriate care. Plaintiff's complaints amount to no more disagreement with Howell's medical judgment or constitute no more than allegations of mere negligence, misdiagnosis, or medical malpractice—which all fail to establish a constitutional violation as a matter of law.

4.     Plaintiff's state law negligence claims are barred by operation of § 768.28(9), *Fla. Stat*. which provides absolute immunity for government employees accused of negligence in the course and scope of their employment.

**WHEREFORE**, Defendant JACK HOWELL, LMHC, requests an Order granting Final Summary Judgment in his favor as to all claims against him.

## STATEMENT OF FACTS

This case involves claims against multiple defendants. However, because "each individual defendant must be judged separately and on the basis of what that person knew," and because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference," *Nam Dang,* 871 F.3d at 1280 (11th Cir. 2017), only those facts known to Howell at the time are relevant to this Motion.

Because Howell was neither present for, nor aware of, the events involving Turner after 5:00 PM on May 18, 201 (events which are the subject of extensive discussion in claims against other Defendants), those events cannot be considered with respect to Howell and are not discussed herein.

2

I.  <u>April 18, 2018, to May 1, 2018</u>.

Turner was arrested in the evening of April 18, 2018, for possession of methamphetamine and presenting a false ID. [ECF. 69-3, pp.1-2]. During transport to the Bay County Jail ("Jail"), Turner made comments to the arresting officer to the effect of: "*If I have to go through this, I am going to kill myself.*" [ECF. 69-3, pp.4-5].

Turner was booked into the Jail on April 19, 2018, at 12:15 AM, [ECF. 69-3, p.6], and given an intake mental health screening at 1:57 AM. [ECF. 69-3, p.7]. In response to his suicidal statements and intake screening, Turner was: (1) placed into protective custody at the Jail under the Baker Act, (2) admitted to the Jail's Level-1 Suicide Precaution protocol ("SP-1"), and (3) referred for mental health evaluation. [ECF. 69-3, p.4; ECF. 69-4, pp.1-4; ECF. 69-1, ¶2].

At the time, Licensed Mental Health Counselor Jack Howell, served as the Jail's Mental Health Coordinator—a position he held continuously for 27-years until his retirement in December 2020. [ECF. 69-1, ¶1]. Howell was the jail's highest-ranking mental health counselor and oversaw the Jail's mental health programs. [*Id*.]. Howell personally met with Turner on the same day of his booking (April 19, 2018). [ECF. 69-1, ¶3; ECF. 69-4, p.6]. Turner, sleep-deprived

and coming down from methamphetamine,[1] admitted that he had frequently had suicidal thoughts in the past, that he had been placed on suicide precautions by another jail during another recent incarceration, and claimed that he had recently attempted to over-dose on drugs. [*Id*.].

Jail mental health staff met with Turner regularly over the next thirteen-days as Turner remained on Level-1 suicide precautions—assessing his condition and documenting encounters on April 23rd, 25th, 26th, 27th, 30th, and twice on May 1st [ECF. 69-1, ¶3; ECF. 69-4, pp.6-13].[2] Of Turner's eight encounters since booking, Howell personally met with Turner on five of them (April 19th, 25th, 26th, 30th, and once on May 1st). [ECF. 69-1, ¶3; ECF. 69-4, pp.6, 9, 10, 12, and 13]. During this time, Turner engaged in no suicidal behaviors, made no suicidal gestures or attempts, made no suicidal threats or statements, and actively denied that he suicidal at every encounter. [*Id*.].

Howell did <u>not</u> have the authority to release Turner from suicide precautions. Rather, Jail policy provided that while Howell could "recommend" a course of action, sole authority on the matter rested with a separate five-member Suicide Prevention Committee, consisting of: (1) a separate mental health

---

[1]    Turner reported that he had used just hours earlier. [ECF. 69-3, p.3; ECF. 69-4, p.5].

[2]    A mental health evaluation was also attempted on April 24, 2018, but could not be completed because Turner was out of his cell. [ECF. 69-4, p.8].

counselor, (2) a member of the Jail's medical staff, (3) a classification officer, (4) the Jail's Segregation Officer, and (5) the Jail's Chief of Security. [ECF. 69-1, ¶4; ECF. 69-5 (Jail Policy 602.00), p.1].

Following Howell's May 1, 2018, encounter with Turner, Howell recommended to the Committee that—pending additional agreement by the Jail's Psychiatrist, Dr. Vicki Alberts—that Turner be removed from suicide precautions. [ECF. 69-1, ¶4; ECF. 69-4, p.17].

Dr. Alberts met with Turner later that same day. At the conclusion of their encounter, Dr. Alberts agreed that Turner no longer required suicide precaution placement, noting: "*No longer needs SP placement; step down as per protocol.*" [ECF. 69-1, ¶5; ECF. 69-4 pp.14-15].

The Jail's suicide protocol requires no particular progression following an inmate's placement on SP-1, but rather vested the Suicide Prevention Committee with discretion as to whether to move the inmate to Suicide Precaution Level-2 (SP-2), Suicide Precaution Level-3 (SP-3), or directly to the General Population (GP).

2. Such inmates shall remain on that status until evaluated by a MHP. After the MHP, has evaluated the inmate, he/she may recommend to the Committee, a skip from SP-1 to SP-3. An example would be if the Detention Staff initially placed an inmate on an SP-1 status, the Mental Health Professional can recommend moving the inmate directly to SP-2, or SP-3, or with the concurrence of the Suicide Precaution Committee, release of the inmate into general population.

3. All recommendations for an inmate to be released from Suicide Precaution Status shall be reviewed and approved by the Suicide Precaution Committee and documented in the inmate's file.

[ECF. 69-5 (Policy 602.00(D)(2)-(3) ("Suicide Precaution"); ECF. 69-1, ¶5].

Dr. Alberts was familiar with this protocol and, by not recommending a specific placement (*i.e.,* "step-down to SP-3"), she did not limit or interfere with the Committee's discretion under the protocol as to where Turner could be moved. [ECF. 69-1, ¶5].

Although not the decisionmaker, Howell did not believe that moving Turner to SP-2 or SP-3 was necessary given: (1) the unusually long time (nearly two weeks) that Turner had been on SP-1,[3] (2) the absence of any suicidal behaviors, gestures, or statements during this time, (3) Turner's consistent and continuing active denials that he was suicidal, and (4) Howell's general interactions with, and assessment of, Turner. [ECF. 69-1, ¶6].

Ultimately, the five-member Suicide Precaution Committee unanimously voted to return Turner to the general population [ECF. 69-1, ¶6; ECF. 69-4, p.17], and Turner was moved to the General Population on May 2, 2018. [ECF. 69-1, ¶6; ECF. 69-4 at p.18].

---

[3] An inmate would typically only spend a few days at SP-1, as longer stays on the highly restrictive status could itself have negative effects. Turner remained on SP-1 for a longer period (13-days) given his Baker Act status, which could not be removed without agreement by Dr. Alberts, which did not occur until May 1, 2018. [ECF. 69-1, ¶6]. But for his Baker Act status, Howell would have recommended that Turner to be moved to SP-2 or SP-3 after only a few days on SP-1. [*Id*.].

## II.   May 2, 2018, to May 17, 2018.

Turner's incarceration in the general population over the following sixteen-days (May 2, 2018, to May 17, 2018) was unremarkable. Turner continued to receive follow-up mental health care, including evaluations on May 2, 2018, and May 9, 2018. [ECF. 69-1, ¶7; ECF. 69-4, pp.19-20]. Between May 2, 2018, and through May 17, 2018, there were no documented mental health issues with Turner. [*Id*.]. Turner continued to actively deny that he was suicidal at each encounter, and he was not known to have engaged in any suicidal behaviors, to have made any suicidal gestures or attempts, or to have made any suicidal threats or statements. [*Id*.].

## III.   May 18, 2018 (date of suicide).

At approximately 2:00 PM, on May 18, 2018, Turner complained to Detention Officer Marcus Roberts about the risk of HIV spreading in the general population dorm—demanding to speak with the Chief of Security about the issue. [ECF. 69-6, p.2; ECF. 69-7, p.15]. Roberts explained that this was a medical issue and provided Turner with paperwork to properly raise his concern. [*Id*.].[4]

---

[4]   Jail staff would later locate a completed sick call request stating: "I had STD tests done at Okaloosa County Health Department sometime last year. I have memory issues so I don't remember and never could remember to get the results." [ECF. 69-4, p.22]. Turner requested the jail to obtain the results for him. [*Id*.].

At approximately 3:00 PM, Turner again approached Roberts demanding to speak with the Chief of Security about the risk of HIV in the dorm. [ECF. 69-6, p.2; ECF. 69-7, pp.17-18]. Turner was upset and agitated. At this time, Roberts was escorting Nurse Mary Jane Ridley, LPN, through the dorm for medication disbursement, and Roberts referred the issue to her. [ECF. 69-7, p.18; ECF. 69-9, p.14]. Ridley evaluated Turner, taking his vitals and talking with him about his concerns. [ECF. 69-9, pp.14-15]. Turner expressly denied that he was suicidal. [ECF. 69-8, p.2; ECF. 69-9, p.21; ECF. 69-6, p.2]. But because he was crying and upset to where he was difficult to understand, Ridley referred Turner to Howell for a mental health evaluation. [ECF. 69-8, p.2; ECF. 69-9, p.15; ECF. 69-1, ¶8; ECF. 69-2, pp.27-28].

At approximately 3:30 PM, Nurse Ridley contacted Howell and requested that he meet with Turner to evaluate his condition. [ECF. 69-1, ¶8]. Ridley explained that Turner was crying and uncooperative and that she was having trouble communicating with him. [ECF. 69-1, ¶8]. The request for an evaluation was commonplace and expected anytime an officer or staff member had concerns about an inmate's mental health status. [*Id*.].

Immediately upon receipt of Ridley's referral, Howell obtained and reviewed Turner's medical file to refresh his memory about Turner. [ECF. 69-1, ¶8]. At 3:40 PM, Officer Roberts escorted Turner to an empty waiting room in the

8

mental health department. [ECF. 69-10 (Waiting room video)]. After reviewing Turner's file in his office, Howell met with Turner there at 3:45 PM. [ECF. 69-1, ¶8; ECF. 69-10].

Howell met with Turner, one-on-one and uninterrupted, for approximately 20-minutes [ECF. 69-10 (Video: 3:45 PM to 4:04 PM)]. Howell's purpose in meeting with Turner was to understand Turner's current situation, assess his thoughts and feelings, provide supportive counseling, and assess whether there was reason to believe that Turner was suicidal and in need of specialized housing. [ECF. 69-1, ¶9].

This was Howell's sixth in-person encounter with Turner. [ECF. 69-1, ¶9]. Because he was already familiar with Turner's history and general situation, Howell was able to focus on Turner's current issues and needs. [*Id.*]. Turner presented as obviously upset and angry, but not suicidal. [*Id.*]. Turner began the conversation by confirming that he was <u>not</u> suicidal and was "not here for that." [*Id.*; ECF. 69-2, p.28 ("He remembered me from suicide watch . . . and so he wanted to assure me right up front that that was not what he needed.")].

Although Howell found Turner's denials of suicidality to be credible, he did not simply take Turner at his word and release him back to the general population. [ECF. 69-1, ¶9]. Rather, Howell continued to meet with Turner over a period of approximately 20-minutes—attempting to ascertain and understand

why Turner had become upset and providing supportive counseling. [ECF. 69-1, ¶9]. Howell asked Turner what he needed and engaged with him on those topics. [*Id*.]. As the conversation progressed, Turner calmed down significantly and expressed himself more rationally. [*Id*.].[5]

Turner was angry about how he was being treated by the guards and because he felt like he was being ignored regarding an important medical issue. [*Id*.]. Turner complained that his treatment by the guards was unfair and unlawful and threatened to retain a lawyer to sue the jail. He complained that he was not being permitted to talk with the Chief of Security or anyone else important about his complaints. [*Id*.]. Howell assured Turner that he would have a chance to talk with the Chief and to otherwise air his grievances—but that it would take time and he would have to be patient and let the process work. [*Id*.]. Turner wasn't happy, but he had calmed down and was future-oriented and did not express any thoughts or feelings of hopelessness or helplessness. [*Id*.].[6]

---

[5]     Howell documented contemporaneous impressions that Turner was "tearful" and "angry," that Turner complained of not being able to sleep, and that his appearance was abnormal. Howell also documented impressions that Turner was oriented to person, place, time, and situation, that his speech (at least over the course of the meeting) had become normal in tone, rate, and structure, that his thought content was within normal limits, orderly, and goal directed, that his judgment and insight were intact, and most importantly, that Tuner actively denied any suicidal ideation. [ECF. 69-4, p.21].

[6]     Assessing an inmate's feeling of hopelessness and helplessness were a core part of every evaluation that Howell performed. [ECF. 69-1, ¶9, fn.4].

At the conclusion of the encounter, Howell did not believe that Turner was suicidal or required specialized suicide housing and released him back to his general population housing. [ECF. 69-1, ¶9; ECF. 69-2, pp.28-29]. Roberts' escorted Turner back to the dorm at approximately 4:05 PM. [ECF. 69-10].

Shortly before to 5:00 PM, Nurse Ridley returned to Howell's office requesting Tuner's medical chart. [ECF. 69-1, ¶10]. Howell told her it was still on his desk because he planned to meet with Turner on Monday morning "to make sure he was still doing okay." [ECF. 69-1, ¶10; ECF. 69-2, pp.29-30]. Ridley told Howell she needed the chart because the dorm officers were moving Turner to Behavioral Observation.[7] [*Id*.].

"Behavioral Observation" is a specific type of confinement at the Bay County Jail used for inmates believed to have behavioral issues that may threaten jail safety and security. Importantly, Jail policy explicitly provides that: "Behavioral Observation is **not** utilized for inmates that are at risk of self-harm," and is "**not** to be utilized as a step down from Suicide Precaution." [ECF. 69-11 (Jail Policy 606.00) (bold emphasis in original); ECF. 69-1, ¶10].

---

[7]    Ridley was not present for the events that caused security to decide to move Turner to Behavioral Observation. Ridley was only told that, after Turner had been returned to general population, Turner was being disruptive and was going to be moved. [ECF. 69-9, p.24]. Ridley required the medical chart back from Howell because Jail policy mandated that all inmates entering confinement receive a pre-confinement medical screening. [ECF. 69-11, p.2].

Turner's movement to Behavioral Observation thus did not signal to Howell that Turner was suicidal; indeed, placement in Behavioral Observation affirmatively signaled that Turner was <u>not</u> believed to be suicidal. [ECF. 69-1, ¶10]. For this reason, and because Howell had just met with Turner less than an hour before, because Howell already planned to follow-up with Turner the following Monday morning, and because *more* secure housing with *greater* supervision did not pose a danger to Turner, Howell did not seek follow-up with Turner again at that time. [ECF. 69-1, ¶10].

Howell ultimately left for the day at 5:00 PM. [ECF. 69-1, ¶11]. He was neither present for—nor knew about at the time—any of the subsequent events involving Turner that night. [*Id*.]. Howell learned of Turner's suicide attempt (discovered by staff at 8:55 PM) only after the fact. [*Id*.]. Turner was later pronounced dead on May 20, 2018, at a local hospital. [ECF-25-1, ¶56].

IV. <u>Experts</u>.

There is broad agreement on many key issues. For example, Plaintiff's mental health expert, Harvey Norris, LCSW, agrees that:

- Determining whether someone is suicidal is "time-sensitive," meaning that it is a "flexible and fluid situation" and that a person who is not suicidal at one moment may become suicidal at a later time. [ECF. 69-12, pp.53-54].

- Absent an overtly suicidal act or statement, determining whether someone may be suicidal requires the exercise of clinical judgment and is not subject to any type of objective testing. [ECF. 69-12, pp.54, 85].

12

- Not everyone who is upset, angry, or crying is suicidal. [ECF. 69-12, p.54].

- Placing Turner on Level-I Suicide Precautions and referring him for mental health evaluation was an appropriate response to Turner's April 18, 2018, suicidal statements to the arresting officer. [ECF. 69-12, pp.61-62].

- From the time of Turner's booking on April 19, 2018, to his release from SP-1 on May 1, 2018, Turner received appropriate mental health care and his risk of suicide was not being ignored or disregarded. [ECF. 69-12, pp.62-63, 67].

- On the day Turner was released from suicide precautions (May 1, 2018), Turner was not clearly suicidal.[8] [ECF. 69-12, pp.66-67].

- There were no events between May 2, 2018 and May 18, 2018, that demonstrated Turner was suicidal. [ECF. 69-12, pp.67-69].

- On May 18, 2018, the record does <u>not</u> show that Turner was clearly suicidal at the time of his encounters with Nurse Ridley or Howell. [ECF. 69-12, p.76; ECF. 69-12, p.82 (Q: "Is it your opinion that Mr. Turner was clearly suicidal at this moment in time? A: "No, sir."].

- Howell did not delay in meeting with Turner after receiving the referral from Nurse Ridley. [ECF. 69-12, p.78].

- Turner's risk of suicide was not ignored or dismissed by Howell during their encounter on May 18, 2018. [ECF. 69-12, p.82].

---

[8]     Norris used the phrase "clearly suicidal" repeatedly in his written report. During deposition, the parties agreed that this term meant that the inmate was such a strong risk of suicide that he should be placed on suicide precautions. [ECF. 69-12, pp.106-07].

- ▪ Turner's placement on Behavior Observation shortly before 5:00 PM on May 18, 2018, did not evince that Turner had become suicidal. [ECF. 69-12, p.110-111].

- ▪ It is possible that Turner was not suicidal at the time of his encounter with Howell, but that he became so during the hours that followed. [ECF. 69-12, p.156].

Plaintiff's primary complaint regarding Howell's care is that he did not use a more specific written suicide assessment form to record his encounters—repeatedly contending that if something was not documented—it didn't happen. This is an incorrect statement of the law, contrary to the facts, and otherwise constitutes an inadmissible opinion.[9] More importantly, Norris admits that there is no requirement that a written form—much less any particular written form—be used. [ECF. 69-12, pp.83-84 (noting that the important thing is the questions that are asked)].

Ultimately, Norris contends that although he doesn't actually know what questions Howell asked, he thinks Howell should have inquired about: (1) Turner's current functioning status, (2) Turner's current feeling and thoughts, (3) whether Turner had made prior suicide attempts, (4) whether Turner was having suicidal thoughts, (5) whether there was a family history of suicide, and (6)

---

[9] While criticism of Howell's documentation practices might be fair game, an expert's opinion that because something was not documented it did not occur, is not. *See Carter v. Griggs*, 16-CV-252-WMC, 2019 WL 5538144, at *7 (W.D. Wis. Oct. 25, 2019) (holding inadmissible the opinion: "If you don't document it, it didn't happen.").

14

whether Turner felt hopeless, helpless, or burdened. [ECF. 69-12, p.86 ("those are the kind of things you ask about as a basis for suicidality.")]. As stated above, and with the exception of inquiry into family history, this was, in fact, *exactly* what Howell did. [ECF. 69-1, ¶9].[10]

## MEMORANDUM OF LAW

### I.   Standard of Review:

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party," and "is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.,* 357 F.3d 1256, 1259–60 (11th Cir. 2004).

The nonmoving party may not rest upon the allegations of his pleadings, but must set forth specific facts showing there is a genuine issue for trial. *Eberhardt v. Waters,* 901 F.2d 1578, 1580 (11th Cir. 1990).[11] "A genuine

---

[10]   To the extent additional background information is necessary, Defendants incorporate the Statement of Facts by Defendant Tommy Ford in his official capacity as Bay County Sheriff. [ECF. 70].

[11]   Speculation does not create a genuine issue of material fact. *Shiver v. Chertoff,* 549 F.3d 1342, 1343 (11th Cir. 2008). "[S]o long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim." *Anderson*, at 257. If the evidence

dispute requires more than some metaphysical doubt as to the material facts. A mere scintilla of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." *Hammett v. Paulding County*, 875 F.3d 1036, 1052 (11th Cir. 2017).

## II.   Plaintiff's federal claims are barred by qualified immunity.

Qualified immunity offers complete protection for government officials sued in their individual capacities so long as their conduct does not violate clearly established law of which a reasonable person would have known. *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). The qualified immunity doctrine permits government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation. *Id*. It "protects from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Id*. (internal quotations omitted).

Because there is no dispute Howell was acting within his discretionary authority,[12] Plaintiff must prove both that: (1) his conduct violated Turner's

---

advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Id.* 249–50.

[12]   In this context, "discretionary authority" simply means that the defendant's actions were taken in the performance of his/her duties and were within the scope of their authority. *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994). *See also Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (an official acts within his discretionary authority if he "perform[s] a legitimate job-related function … through means that [are] within his power to utilize").

constitutional rights, and (2) such rights were "clearly established at the time." *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020).

"[E]ach defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018) (reversing the denial of qualified immunity where the trial court "did not individually evaluate each defendant's specific actions and omissions."). Because Plaintiff cannot show Howell violated Turner's clearly established constitutional rights, Howell is entitled to summary judgment as a matter of law.

### i. *Howell did not violate Turner's constitutional rights.*

Pretrial detainees have a Fourteenth Amendment right "to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005).[13]

To prevail in a prisoner suicide case under 42 U.S.C § 1983, "the plaintiff must show that the jail official displayed deliberate indifference to the prisoner's

---

[13]    "The minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner." *Jacoby v. Baldwin County*, 596 Fed. Appx. 757, 763 (11th Cir. 2014) (quoting *Lancaster v. Monroe Cnty., Ala.,* 116 F.3d 1419, 1425 n. 6 (11th Cir. 1997). *See also Nam Dang by & through Vina Dang v. Sheriff, Seminole County Florida*, 871 F.3d 1272, 1279 (11th Cir. 2017).

taking of his own life." *Jackson v. West*, 787 F.3d 1345, 1353 (11th Cir. 2015). *See Salter for Estate of Salter v. Mitchell*, 711 Fed. Appx. 530, 537 (11th Cir. 2017) ("[D]eliberate indifference has become the barometer by which suicide cases involving convicted prisoners as well as pretrial detainees are tested."). Deliberate indifference "is a difficult standard for a plaintiff to meet*." Salter* at 537 (*citing Popham v. City of Talladega*, 908 F.2d 1561, 1563 (11th Cir. 1990)).

Deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm, (2) disregard of that risk, (3) by conduct that is more than gross negligence. *Patel v. Lanier County Georgia*, 969 F.3d 1173, 1188 (11th Cir. 2020); *Hoffer v. Sec'y, Florida Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020).

Here, although Turner's suicidal statements to his arresting officer on April 18, 2018, certainly evinced a serious risk of suicide, there is also no legitimate dispute that Howell and the Jail responded reasonably to that issue and provided Turner with constitutionally adequate care upon his admission to the facility and through May 17, 2018. The issue for the Court's determination is whether Howell's response to events on May 18, 2018, constituted deliberate indifference to a serious risk of suicide on that date. For the reasons described below, they do not, and summary judgment should be entered for Howell.

### a) *Howell did not know there was a strong likelihood of suicide.*

In a prison suicide case, the first element of deliberate indifference requires proof that the defendant actually/subjectively understood that there was "*a strong likelihood* rather than a mere possibility that the self-infliction of harm will occur." *Cook*, 402 F.3d at 1115 (internal quotation marks omitted) (italics in original). The defendant must have been "subjectively aware that the *combination* of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings create[ed] a strong likelihood that the prisoner [would] commit suicide." *Gish v. Thomas,* 516 F.3d 952, 954–55 (11th Cir. 2008) (emphasis in original). The subjective knowledge component requires that the defendant not only be "aware of facts from which the inference [of a strong likelihood of suicide] could be drawn," but proof that the defendant himself "actually [drew] that inference." *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003).

In this Circuit, "the only circumstance recognized as providing a sufficiently strong likelihood of an imminent suicide attempt is a prior attempt or threat." *Gamez v. Brevard County, Fla.*, 2007 WL 1626734, at *11 (M.D. Fla. June 5, 2007). *See e.g. Holland v. City of Atmore*, 168 F. Supp. 2d 1303, 1310-11 (S.D. Ala. 2001), *aff'd,* 37 Fed. Appx. 505 (11th Cir. 2002) ("[O]nly a limited range of facts are sufficient to show the existence of a 'strong likelihood' that a particular detainee will commit suicide. . . . The only circumstance recognized as providing

19

a sufficiently strong likelihood of an imminent suicide attempt is a prior attempt or threat.).

If the knowledge possessed by the defendant allows an inference of no more than "a mere possibility" of suicide, there is no deliberate indifference. *Fowler v. Chattooga County, Ga.*, 307 Fed. Appx. 363, 365 (11th Cir. 2009). *See also Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1268-69 (11th Cir. 2005) ("The mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners."). Thus, a defendant's knowledge of an inmate's mere sadness, anger, or unhappiness have all been held insufficient. *Holland* at 1331.

Here, the evidence does not support that Howell had general knowledge that Turner was at a serious and imminent risk of suicide on the morning of May 18, 2018. By that time, Turner had been an inmate at the jail for 29-days and had received regular mental health evaluations—many by Howell himself. During this period, Turner: (1) had never engaged in any suicidal behaviors; (2) had made no suicidal gestures; (3) had made no suicidal threats or statements, and (4) had actively, and consistently, denied that he was suicidal at every encounter.

Indeed, as early as May 1, 2018, the record is clear that jail staff—including Howell, Dr. Alberts, and all five members of the Suicide Precaution Committee—all agreed that Turner was not suicidal and no longer required

specialized suicide precaution housing. Turner's next 16-days in the general population without issue—and while Turner continued to actively deny suicidality—did nothing to change this assessment. Thus, although suicide was perhaps always a possibility for Turner given his history and other risk factors, by the morning of May 18, 2018, no reasonable jury could find that Howell must have believed there was a "strong likelihood" that Turner would commit suicide that day.[14]

Plaintiff must therefore prove that events on May 18, 2018, and known to Howell, were such that Howell *must have* subjectively concluded there was a strong likelihood that Turner would commit suicide. Plaintiff's evidence falls far short of the required proof.

The undisputed evidence shows that when Howell met with Turner at 3:45 PM, and Turner expressly and directly told Howell he was not suicidal. Although Turner was upset and angry about his treatment by the guards, Howell counseled Turner and he calmed down significantly. Howell found Turner's denial of

---

[14] Turner's suicidal threats a month earlier were insufficient. In *Salter for Estate of Salter v. Mitchell*, 711 Fed. Appx. 530 (11th Cir. 2017), for example, an inmate committed suicide just 6-days after being released from suicide precautions and 12-days after *attempting* suicide. The Eleventh Circuit held that the defendant's knowledge of this history was insufficient to subjective knowledge of a serious risk of suicide because she "had not witnessed any behavioral issues in the three days leading up to the suicide." *Id*. at 541 ("the Court cannot find that [the defendant's] awareness of Salter's most recent suicide attempt equates to deliberate indifference on her part.").

suicidality credible. There is no evidence that Turner had recently threatened suicide, attempted suicide, or made any overtly suicidal gestures or acts which indicated he was currently suicidal.

These facts are wholly insufficient to demonstrate that Turner was a strong likelihood to commit suicide. *Holland*, at 1310-11 ("The only circumstance recognized as providing a sufficiently strong likelihood of an imminent suicide attempt is a prior attempt or threat."). Plaintiff's contention that because Turner was upset and angry, Howell must have known he was suicidal is without factual or legal support. Even Plaintiff's expert, Norris, admits that the record does not support a conclusion that Turner was suicidal at that time.

While Plaintiff has complained that Turner's various "risk factors" for suicide (*i.e.,* that he was male, that he was incarcerated, that he had a history of substance abuse, that he suffered from depression, that he allegedly had issues with "impose control," *etc.*), should have been the cause for greater concern, such risk factors at most created only a *possibility* for suicide. [ECF. 69-13, p.5 ("No factor, or combination of factors, [is] strongly associated with suicide. . . most people have at least one, many have a few.")].

Moreover, even if Turner's presentation on May 18, 2018, combined with his historical risk factors might have suggested a strong likelihood of suicide to others, there is no evidence that *Howell* subjectively believed that to be the case.

Howell's actions evince serious and good faith attempt to evaluate, assess, and genuinely help Turner. That after these efforts Howell's released Turner back to his general population housing merely confirms that *he* did not believe Turner was substantially likely to commit suicide.

Finally, although Howell was advised prior to leaving for the day that dorm officers were moving Turner to the Jail's Behavioral Observation dorm, there is no reason this move should—much less did—cause Howell to believe that Turner had become suicidal. Jail policy was clear that Behavioral Observation is not to be used for inmates who are believed to be at risk for self-harm. Because *more secure* housing posed no risk to Turner, Howell's plan to meet with Turner on the following Monday morning was reasonable.

Plaintiff cannot remotely establish that Howell subjectively understood or believed there to be strong likelihood of suicide and Plaintiff's deliberate indifference claim therefore fails as a matter of law. The Court need go no further, and Howell's remaining arguments are presented only in an abundance of caution.

### b) *Howell did not act with deliberate indifference.*

The second and third elements of medical deliberate indifference require that a provider's response "be more than an inadvertent failure to provide adequate medical care, negligence in diagnosis or treatment, or medical malpractice." *McLeod v. Sec'y, Florida Dep't of Corr.*, 679 Fed. Appx. 840, 843

23

(11th Cir. 2017). *See also Ray v. Foltz*, 370 F.3d 1079, 1083 (11th Cir. 2004) ("Deliberate indifference is not the same thing as negligence or carelessness."); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (the defendant's response to the medical need must be more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law."); *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994) ("Accidents, mistakes, negligence, and medical malpractice are not constitutional violation[s] merely because the victim is a prisoner.").

Rather, for care to rise to the level of a constitutional violation, it must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir.1991); *Whitley v. Albers*, 475 U.S. 312, 319 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize [deliberate indifference].").

Where, as here, an inmate has received care, and the dispute is merely over its adequacy, federal courts are reluctant to question the appropriateness of the medical judgments that were made. *Harris*, 941 F.2d at 1507 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989) (observing that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation"). *See also Maglio v. Bhadja,* 257 Fed. Appx. 234, 235-36

24

(11th Cir. 2007) (no deliberate indifference where staff "provided some treatment, but diagnosed and treated [the plaintiff] incorrectly."); *Gonzalez v. Archer*, 5:16CV34/LAC/EMT, 2020 WL 5242413, at *5 (N.D. Fla. Apr. 7, 2020) ("Ordinarily, there is no constitutional violation when some measure of treatment is provided."). To do otherwise would be "to constitutionalize claims that sound in tort law." *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted).

Similarly, "[d]eliberate indifference requires evidence of 'something more than a medical judgment call.'" *Troyanos v. Coats*, 372 Fed. Appx. 932, 935 (11th Cir. 2010) (quoting *Rogers v. Evans*, 792 F.2d 1052, 1060 (11th Cir.1986) (*en banc*)). This includes a provider's judgment as to the diagnostic techniques or forms of treatment used. *See Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[A]s *Estelle* teaches, the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the [constitution].") (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)).

Similarly, a mere "difference in medical opinion does not constitute deliberate indifference so long as the treatment is minimally adequate." *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010); *Hoffer*, 973

25

F.3d at 1277 (11th Cir. 2020) (nothing that under the constitution, "minimally adequate care  . . . [is] quite minimal.").

Rather, deliberate indifference occurs when, despite knowing of a serious risk, a provider completely denies readily available treatment, unreasonably delays treatment for non-medical reasons, or knowingly provides treatment so slight and so cursory "as to amount to no treatment at all" *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011); *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994). A provider may also be deliberately indifferent if they knowingly provide care that is "grossly inadequate" or "less efficacious" simply because it is easier. *Steele v. Shah*, 87 F.3d 1266, 1269–70 (11th Cir. 1996). The Eleventh Circuit has cautioned, however, that the plaintiff must not only prove that the care provided was objectively cursory, perfunctory, or otherwise "grossly inadequate," but that the defendant also subjectively "knew their care was grossly inadequate." *Campbell v. Sikes*, 169 F.3d 1353, 1366 (11th Cir. 1999) (confirming that "[w]ithout evidence to establish the *subjective* mental intent prong of deliberate indifference, [the mental health defendants] are entitled to summary judgment*.*").

This is not a case where Howell completely denied, or unreasonably delayed, providing Turner with care. Nor is this a case where it can be said that Howell's care was so "cursory" or "grossly inadequate" as to amount to no care

at all, or that he provided "less efficacious" care simply because it is easier. The undisputed evidence shows that although Turner was well known to Howell, Howell still took the time to pull and reviewed Turner's medical file before meeting with Turner, and then met with Turner, face-to-face and one-on-one, for an extended period of approximately 20 uninterrupted minutes. The undisputed evidence is that Howell used this time to better understand Turner's situation, to provide supportive counseling, and to assess whether there was reason to believe that Turner was suicidal. These efforts simply do not bespeak deliberate indifference.

Plaintiff's allegation that Howell merely took Turner at his word that he was not suicidal and released him back to the general population is demonstrably false. Although Howell did find Turner's denials to be credible, this was not a perfunctory one, two, or even five-minute encounter.[15] Rather, even after Turner's denials, Howell continued to meet with Turner over a 20-minute period—

---

[15]    *C.f. Steele v. Shah*, 87 F.3d 1266 (11th Cir. 1996) (concluding that a jury could reasonably find deliberate indifference where provider discontinued an inmate's psychotropic medication after he saw the inmate for "less than one minuet," "did not review any medical records" other than a medication chart, and ignored letters from other doctors indicating a need for medication), and *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990) (provider discontinued medication for a schizophrenic inmate with suicidal tendencies after conducting only a "perfunctory" evaluation that lasted "just a few minutes.").

attempting to ascertain why he had become so upset and to understand what he needed.

Although Plaintiff disagrees with Howell's ultimately determination, such a disagreement with Howell's professional judgment in the moment is wholly insufficient for constitutional liability. At worst, there is professional disagreement. [ECF. 69-13, p.3 (confirming that Howell's evaluation was proper and reasonable for the situation)]. Similarly, while Plaintiff complains that Howell did not properly document the encounter, or maybe ask every question Plaintiff thinks should have been asked, these again are either challenges to Howell's medical judgment,[16] or sound in mere negligence or malpractice.

Even if the Court could find that Howell's care was objectively perfunctory, cursory, or grossly incompetent, there remains *zero* evidence that Howell *subjectively* knew or believed his care was deficient.[17] The record reveals and confirms that Howell made a good faith attempt to provide Turner with prompt

---

[16]     [ECF. 69-13, p.2 (noting that, contrary to Plaintiff's argument: "There is no standard or best practice that dictates the use of a specific instrument or process. The majority of suicide risk assessments - whether in correctional facilities, hospitals, or outpatient settings – are completed in the course of a larger clinical contact using an interview format rather than a paper/pencil tool.")].

[17]     Filling out the forms or asking the questions Plaintiff thinks *should* have been asked, would not have taken any more time than Howell was already spending with Turner. It would be absurd for Howell to use this time ignoring questions he _knew_ he should have been asking to ask questions he *knew* would not be probative.

and considered care. This is all that is required. Howell need not prove that his care was perfect, or even "very good." *Harris* 941 F.2d at 1510 ("[A]s with all medical care provided to prisoners, it is not constitutionally required that . . . care be perfect, the best obtainable, or even very good."). Even if Howell's actions were somehow "wrong," there is simply no evidence that they were the result of "obduracy and wantonness," rather than "inadvertence or [an] error in good faith," *Adams,* 61 F.3d at 1543 (quoting *Whitley v. Albers,* 475 U.S. 312 (1986)).

The testimony of Plaintiff's retained experts, who unsurprisingly find fault with Howell's judgment and care, is insufficient to establish Howell's liability. Beginning with *Campbell*, the Eleventh Circuit no longer deems a disagreement among experts as to the quality of care sufficient to create a triable jury question. *See Campbell*, 169 F.3d at 1370–71 ("allowing expert testimony that [a defendant] should or would have known [of a strong likelihood of harm] to raise a jury issue as to whether [the defendant] actually knew effectively would nullify [the] requirement of subjective mental intent."). Rather, a defendant's actual knowledge that their care was grossly incompetent or inadequate must be shown from the facts of the case itself, such as in *Steele* or *Greason*, where the grossly inadequate care was so obvious that a jury could reasonably infer the defendant's actual knowledge. *Id*. at 1371-72. There is simply no such evidence in this case.

29

Finally, Plaintiff's allegations are also too speculative to establish causation. Plaintiff simply cannot prove that Turner was suicidal when he met with Howell. It is possible that Turner was honest with Howell and that although he was upset and angry—he had no suicidal intent or plan at that time and made his tragic decision hours later. [ECF. 69-14 ("[T]he research tells us that the bulk of suicide, upwards of three-quarters . . . are impulsive, with the majority of the individuals making the definitive decision to act on suicidal thoughts within the last day, if not within the last few minutes, actually within the last hour or last few minutes.")]. Plaintiff's theory that if Howell had just asked "the right" questions he might have realized that Turner was suicidal is gross and baseless speculation. *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1326 (11th Cir. 1982) (an inference must be reasonable, otherwise a jury would be "allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility."); *Weathers v. Lanier*, 280 Fed. Appx. 831, 833 (11th Cir. 2008) ("Because Weathers has not demonstrated proximate cause by a preponderance of the evidence, we need not consider whether Defendants acted with deliberate indifference to Raynell's serious medical needs.").

ii.   Howell's *actions* did not violate clearly established law.

Even if Plaintiff could prove that Howell's actions violated Turner's constitutional rights, Plaintiff's claim still fails because they were not contrary to clearly established law.

30

"For the law to be clearly established to the point that qualified immunity does not protect a government official, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *King v. Pridmore*, 961 F.3d 1135, 1145 (11th Cir. 2020).

"The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality," but rather "the clearly established law must be 'particularized' to the facts of the case." *King v. Pridmore*, 961 F.3d 1135, 1145 (11th Cir. 2020) (listing cases). A plaintiff must ultimately demonstrate that the particularized issue had already been decided by a decision of the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court, that a broader principle established by these courts controlled the novel facts, or that the defendant's conduct just so obviously violated the constitution that prior case law was unnecessary. *Id.*

Here, Howell's actions, if unconstitutional, were not clearly established as being so in May 2018. For example, to the extent that the Court were to hold that the constitution requires mental health providers to use a written tool when assessing the risk of suicide, or to ask specific questions, such would a first anywhere. Similarly, if the Court were to hold that the constitution mandates that

inmates who present as upset and angry must be deemed to be suicidal, such would also be a first. Because Plaintiff's negligence theories are/were not clearly established to violate the constitution, Howell is entitled to summary judgment.

III.   <u>Plaintiff's state law claims are barred by sovereign immunity.</u>

Florida law provides absolute sovereign immunity from suit to governmental employees accused of committing negligence in the course and scope of their governmental employment:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property[.]

§ 768.28(9)(a), *Fla. Stat.*

Rather, when a government employee acts within the scope his or her employment and does not act with bad faith, malicious purpose, or wanton and willful disregard of human rights, safety, or property, the "exclusive remedy" for a party injured by the employee's negligence is an action against the governmental entity itself:

> The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity . . . unless such act or omission was committed in bad faith or with

32

> malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

§ 768.28(9)(a), *Fla. Stat*. *See Keck v. Eminisor*, 104 So. 3d 359, 363, 366 (Fla. 2012) ("If a State officer, employee, or agent acts within the scope of employment and does not act in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard, the plaintiff's exclusive recourse is to seek damages from the governmental entity.").

In this context, the term "wanton" means "with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property," *Peterson v. Pollack*, 290 So. 3d 102, 110 (Fla. 4th DCA 2020), and is thus materially identical to the federal deliberate indifference standard.[18] Thus, "the standard to overcome immunity [under § 768.28(9)(a)] is *at least* as high as the standard needed to prove [a plaintiff's] § 1983 [deliberate indifference] claims." *Valdes v. Crosby*, 390 F. Supp. 2d 1084, 1108 (M.D. Fla. 2005) (emphasis added), *aff'd*, 450 F.3d 1231 (11th Cir. 2006).

---

[18]   The remaining terms of § 768.28(9)(a) require conduct *even more severe* than mere deliberate indifference. The terms "bad faith" and "malicious purpose" are constructed to require "actual malice," which means the conduct "must be committed with ill will, hatred, spite, or evil intent." *See N.R. by Ragan v. Sch. Bd. of Okaloosa County, Florida*, 418 F. Supp. 3d 957, 989 (N.D. Fla. 2019), and *Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. 4th DCA 2020). The term "willful," means a wrong committed "intentionally, knowingly and purposely." *Peterson* at 109.

Plaintiff's state law claims thus fail for the same reasons stated above: Howell's conduct, at most, amounts to no more than negligence in the performance of his regular duties. Because Plaintiff's state law claims are barred by § 768.28(9)(a), *Florida Statutes*, Howell is entitled to summary judgment as a matter of law.

<u>CERTIFICATE OF COMPLIANCE</u>

The foregoing Statement of Facts and Memorandum of Law complies with Local Rule 56.1(B) as it contains only 7,714 words.

Respectfully submitted this <u>21st</u> day of December 2020.



*/s/ Scott J. Seagle*



Scott J. Seagle, (FBN: 57158)
Gwendolyn P. Adkins (FBN: 0949566)
sjseagle@coppinsmonroe.com
gadkins@coppinsmonroe.com
jclark@coppinsmonroe.com

COPPINS MONROE, P.A.
1319 Thomaswood Drive, Tallahassee, FL 32308
Office: 850-422-2420 | Fax: 850-422-2730

ATTORNEYS FOR DEFENDANT
JACK HOWELL, MS, LMHC

<u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Civil Procedure 5(b)(3) and N.D. Florida Local Rule 5.1, this document is being filed electronically and service shall be through the Court's transmission facilities on all persons appearing before this Court.

*/s/ Scott J. Seagle*